[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No.  18-13920

_____

D.C. Docket No. 9:17-cv-81254-DMM


PBT REAL ESTATE, LLC,

                                                      Plaintiff-Appellant,

versus

TOWN OF PALM BEACH, et al.,

                                                      Defendants-Appellees.


_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(February 22, 2021)

Before MARTIN, TJOFLAT, and TRAXLER,* Circuit Judges.

TJOFLAT, Circuit Judge:

_____

    * The Honorable William B. Traxler, Senior United States Circuit Judge for the Fourth
Circuit, sitting by designation.

Florida law authorizes a municipality to relocate the electrical, telephone, and cable television utilities within a city by placing them underground and levying a special assessment on real property benefited by the relocation.[1]  In July 2017, the Town of Palm Beach (the "Town") decided to underground the utilities servicing some of its neighborhoods and to finance the project by levying special assessments on the properties serviced.  The condominiums in Palm Beach Towers ("PB Towers") were included.

PBT Real Estate, LLC ("PBT"), owns one of those condominiums.  After the Palm Beach Town Council resolved to implement the project, PBT, on behalf of itself and the owners of the other condominiums, sought an injunction in state court barring the Town from levying a special assessment against their properties. PBT initially argued that the assessments would be invalid because the utilities

---

[1] Florida law provides that

(1) Any municipality of this state may, by its governing authority: . . . .

(d) Pay for the relocation of utilities, including the placement underground of electrical, telephone, and cable television services, pursuant to voluntary agreement with the utility. . . .

(k) Provide for the payment of all or any part of the costs of any such improvements by levying and collecting special assessments on the abutting, adjoining, contiguous, or other specially benefitted property. . . .

(2) Special assessments may be levied only for the purposes enumerated in this section and shall be levied only on benefited real property at a rate of assessment based on the special benefit accruing to such property from such improvements when the improvements funded by the special assessment provide a benefit which is different in type or degree from benefits provided to the community as a whole.

Fla. Stat. § 170.01.

2

servicing their properties had already been undergrounded through a privately funded project.[2]  But before the state court could rule on their application for injunctive relief, PBT amended its complaint to allege that requiring it and the other condominium owners to pay the special assessments would violate their Fourteenth Amendment rights to substantive due process and equal protection of the laws and would violate Florida state law.  Following this amendment, the Town removed the case to the United States District Court for the Southern District of Florida.

The case is before us on appeal following the District Court's rejection of the owners' claims.  The District Court granted both the Town's motion for summary judgment on the owners' substantive due process and equal protection claims and the Town's motion to dismiss the owners' state law claims.  We affirm the District Court's judgment on all claims except for one state law claim.

I.

As early as 2006, the Town began developing a plan for undergrounding its utilities—a process that involves burying the existing overhead electrical,

---

[2] The Florida Supreme Court has declared that "[t]here are two requirements for the imposition of a valid special assessment.  First, the property assessed must derive a special benefit from the service provided.  Second, the assessment must be fairly and reasonably apportioned among the properties that receive the special benefit." *City of Boca Raton v. State*, 595 So. 2d 25, 29 (Fla. 1992) (citations omitted).

3

telephone, and cable wires.  The Town decided to undertake the undergrounding process on a gradual basis, "by neighborhood or area," and fund it by levying special assessments on property owners within the area.

Over the next several years, the Town retained two financial services firms to assist with finding a basis for imposing non-ad valorem special assessments on properties within the Town to fund utility undergrounding projects.  Willdan Financial Services prepared a report in 2009, and Raftelis Financial Consultants provided an updated report in 2017.  In their respective reports, Willdan and Raftelis provided that the apportionment of the special assessment would be determined by assigning a number of "Equivalent Benefit Units" ("EBUs") to each property based on the anticipated value the property would receive from undergrounded utilities.  The EBU calculation took into account three types of benefits: increased reliability of services, increased safety due to the removal of poles and overhead lines, and increased aesthetic value from removing lines and poles from sight.[3]  Higher EBU values assigned to a property would correspond with higher special assessments.

Between 2009 and 2017, the Town undergrounded the utilities in some limited areas and levied special assessments on the property owners in those areas

---

[3] The reports allocated to all parcels a minimum number of baseline EBUs for each category, regardless of whether there were overhead lines on or adjacent to the property, in recognition of the town-wide benefits that undergrounded utilities would bring.

pursuant to the methodology detailed in the Willdan Report. The utilities servicing Palm Beach Towers were among those undergrounded during this period, but the project was financed privately and was not subject to a special assessment payable to the Town.

On June 13, 2017, the Town Council passed an Initial Assessment Resolution authorizing the Town to create an "Underground Utility Assessment Area" (the "Project") and specially assess property owners to fund the cost of the Project. The Town Council determined that the Project "w[ould] provide a special benefit to all [properties] located within the Underground Utility Assessment Area" in the form of enhanced safety, reliability, and aesthetics. The resolution adopted the methodology of the Raftelis Report to calculate the amount of anticipated benefit for each property and the corresponding amount of special assessment for each property owner. The resolution excluded from the town-wide assessment those properties with already-undergrounded utilities, which were previously subject to a special assessment.

Commensurate with its adoption of the Initial Assessment Resolution, the Town Council published a notice that informed the public and the owners of all properties within the assessment area of the proposed special assessments. The

notice announced that on July 12, 2017, the Town Council would conduct a public hearing with respect to the imposition of the proposed special assessments.[4]

A PBT representative appeared at the July 12 hearing and contested PBT's proposed assessment obligation. The representative had two "specific objections . . . to the special assessment." First, PB Towers had "already undergrounded its utilities." Second, the "property [would] not benefit from the Town-wide underground project in an amount that exceed[ed] the amount of the special assessment that [PBT] w[ould] be required to pay."[5] At the conclusion of the hearing, the Town Council passed a Final Assessment Resolution (the "Resolution"), which officially imposed the special assessment as described in the Initial Assessment Resolution.

---

[4] Fla. Stat. § 170.07, "Publication of preliminary assessment role," provides, in pertinent part:

> Upon the completion of said preliminary assessment roll, the governing authority of the municipality shall by resolution fix a time and place at which the owners of the property to be assessed or any other persons interested therein may appear before said governing authority and be heard as to the propriety and advisability of making such improvements, as to the cost thereof, as to the manner of payment therefor, and as to the amount thereof to be assessed against each property so improved. Thirty days' notice in writing of such time and place shall be given to such property owners.

Fla. Stat. § 170.08, "Final consideration of special assessments; equalizing board to hear complaints and adjust assessments; rebate of difference in cost and assessment," provides that, prior to any "final decision on whether to levy [a] special assessment[]," the "governing authority of the municipality shall meet and hear testimony from affected property owners as to the propriety and advisability of making the improvements and funding them with special assessments on property."

[5] PBT's representative said that he would be paying far more for the PBT "500-square-foot unit" than two other properties, "Testa's restaurant" and the "old Texaco gas station," whose square footage exceeded that of the PBT condominium "by over 1,000 percent."

6

II.

On August 1, 2017, PBT, proceeding on behalf of itself and the owners of the other condominiums in PB Towers, filed a Complaint in the Circuit Court for the Fifteenth Judicial Circuit of Florida alleging that their special assessments were invalid under Florida state law on two grounds: (1) The Project "d[id] not provide a 'special benefit' to the [PB Towers] properties" and (2) the Towers special assessments were based on "appraisal practices that differ[ed] from the appraisal practices generally applied by the Town to comparable properties with underground utilities."  The Complaint sought an order permanently enjoining the Town and Palm Beach County's property appraiser and tax collector from enforcing the special assessments (the "Assessments").  Instead of proceeding in this manner, on September 22, 2017, PBT moved the Circuit Court for leave to amend the Complaint and substitute the proposed Amended Complaint attached to its motion.[6]  On November 1, 2017, the Circuit Court granted the motion, and the Amended Complaint became operative.

The Amended Complaint contained two counts, both seeking an order permanently enjoining the Town from enforcing PBT's special assessments and

---

[6] The record is silent as to the Town's response to the Complaint, *i.e.*, whether it moved to dismiss the Complaint or simply filed an answer.

7

awarding it attorney's fees.[7]  In Count I, PBT claimed that the Assessment

violated the Takings Clause of the Fifth and Fourteenth Amendments.[8]  In

Count II, PBT alleged that the Assessments violated the Equal Protection

Clause of the Fourteenth Amendment by not "imposing [the] same [special

assessment] on other properties similarly situated."

The Amended Complaint's assertion of federal constitutional claims

rendered the case removable to federal district court.  The Town promptly

removed the case[9] and shortly thereafter moved the District Court to dismiss the

Amended Complaint for failure to state a claim for relief.[10]  The Court granted

the Town's motion.

---

[7] Counts I and II based PBT's entitlement of relief on 42 U.S.C. § 1983.  *See* 42 U.S.C. § 1988(b).

[8] Count I was entitled "Taking Under United States Constitution's Fifth and Fourteenth Amendments, Florida Constitution and 42 U.S.C. § 1983."  Count I appeared to assert five distinct claims: (1) that the Town exceeded the police powers delegated to it (presumably by Fla. Stat. §§ 170.01(1)(d), (1)(k), and (2), which together give municipalities the power to finance the relocation of utilities by special assessment); (2) that the Town deprived PBT of "its rights, privileges, and immunities" and "due process of law" in violation of section 1 of the Fourteenth Amendment; (3) that the Town Council's imposition of the Assessments violated Article VII, §§ 1(a) and 9(a) of the Florida Constitution; (4) that the Town Council's imposition of the Assessments violated Fla. Stat. § 166.021(3)(b); and (5) that the Assessments imposed a lien on PBT's property and thus constituted a taking under the Takings Clause of the Fifth Amendment as incorporated into the Fourteenth Amendment via its Due Process Clause.  As indicated *infra,* the District Court dismissed the Takings Clause claim.  In its Second Amended Complaint, PBT realleged the "taking" as a violation of the substantive component of the Due Process Clause of the Fourteenth Amendment.

[9] *See* 28 U.S.C. §§ 1441(a); 1446.  To the extent Count I of the Amended Complaint presented state law claims, *see supra* n.8, the District Court had jurisdiction to entertain them under 28 U.S.C. § 1367.

[10] *See* Fed. R. Civ. P. 12(b)(6).

8

The District Court interpreted Count I as alleging only a Fifth Amendment Takings Clause claim and dismissed it because "the Takings Clause does not apply to [a] mere obligation to pay an assessment."[11]  The Court then dismissed Count II because its allegation that "there are similarly situated properties that were treated differently" was a mere conclusion.  Specifically, Count II failed to allege that the properties were "similarly situated 'in light of all the factors that would be relevant to an objectively reasonable governmental decisionmaker.'"  The Court dismissed Count I with prejudice and Count II without prejudice, with leave to amend.

PBT responded with a Second Amended Complaint containing three counts.[12]  In Count I, PBT transformed the Takings Clause claim asserted in Count I of the Amended Complaint into a claim under the substantive component of the Due Process Clause of the Fourteenth Amendment: the Assessments were "not rationally related to serve a legitimate government interest" and were imposed by the Town Council "arbitrarily" under "capricious ad hoc ['unwritten'] rules."  In Count II, PBT realleged its Equal Protection Clause claim, stating that "other similarly situated properties" which "will not have their utility lines undergrounded by [the Project]," were being "intentionally treated differently," in that they did not

---

[11] This quoted language was taken from our decision in *Swisher International, Inc. v. Schafer*, 550 F.3d 1046, 1049 (11th Cir. 2008).

[12] Like its predecessor complaint, the Second Amended Complaint sought relief from the alleged federal constitutional violations under 42 U.S.C. § 1983.  It also sought attorney's fees under 42 U.S.C. § 1988(b).

receive a special assessment.  In Count III, PBT alleged that the Assessments

constituted an "unconstitutional tax" under the "Florida Constitution and Florida

law" because the Project did not "confer" a special benefit on the PB Towers

properties.[13]  To the extent "any special benefit," might have been conferred, "it

d[id] not exceed the Special Assessment the Town [Council] has imposed on

PBT's properties."

The Town moved to dismiss the Second Amended Complaint, contending

that none of the three counts stated a claim for relief.  The District Court agreed

and granted the motion.  The Count I substantive due process claim was deficient

because, despite the allegation that the Assessments were the product of ad hoc

"unwritten rules," Count I "never describe[d] these 'unwritten rules' or specifie[d]

who 'engaged' in them."[14]  Nor did it state whether the rules were created

legislatively or administratively.  The Court dismissed PBT's Count II claim under

the Equal Protection Clause for the reason it dismissed Count II of the First

Amended Complaint: the facts alleged were insufficient to show that the other

---

[13] We assume that the reference to the Florida Constitution and law was to Article VII, §§ 1(a) and 9(a) of the Florida Constitution and Fla. Stat. § 166.021(3)(b) since those provisions, although not explicitly referenced in Count III, appeared in the allegations made antecedent to Count I and were incorporated into Count III by reference.

[14] Count I was silent as to whether the Town Council's imposition of the Assessments was an executive decision or a legislative act.  The District Court explained that in order for PBT to plausibly state a claim that substantive due process protects its state-created property rights, it would have to show that the imposition of the Assessments constituted a "legislative act."

10

"similarly situated properties were actually similarly situated in light of "all the factors that would be relevant to an objectively reasonable government decisionmaker."  And Count III was insufficient because it alleged "a violation of Florida law generally," without identifying the provisions of the Florida Constitution or the law allegedly violated.

The order dismissing the Second Amended Complaint gave PBT leave to file a third amended complaint, in which PBT again raised three claims for relief. Count I, based once again on the substantive component of the Due Process Clause, alleged that Assessments, imposed by the Town Council legislatively, were "arbitrary and capricious without any rational basis," in that the Project "d[id] not improve the safety, reliability, or aesthetics of PBT's property."  Count II, based (as before) on the Equal Protection Clause, alleged that the Assessments denied PBT equal protection of the law because the Resolution exempted similarly situated property owners (the "Comparators") from paying a special assessment.[15] Count III replicated Count III of the Second Amended Complaint in asserting that the Assessments amounted to an "unconstitutional tax" under the "Florida Constitution and Florida law" because the Project conferred no special benefit on the PB Towers properties.  Count III additionally asserted that if the Project

---

[15] PBT sought relief on the claims in Counts I and II under 42 U.S.C. § 1983 and attorney's fees under 42 U.S.C. § 1988(b).

11

conferred a special benefit, the amount of the Assessments exceeded the special benefit and, to that extent, the Assessments constituted a "taking [of] property without due process of law under Florida law."[16]

The Town responded to the Third Amended Complaint by moving the District Court for summary judgment on Counts I and II and for dismissal of Count III for failure to state a claim for relief.[17] The District Court granted both motions. Addressing Count I, the Court treated PBT's substantive due process claim as a challenge to the Resolution itself rather than its application to PBT. Having done so, the Court concluded that the claim could not withstand summary judgment because PBT presented no evidence that the Resolution was not "rationally related to a legitimate government purpose." Turning to Count II, the Court found PBT's equal protection claim insufficient for the reasons it stated in denying the claim earlier: PBT failed to "come forward with any evidence to show that [it] is similarly situated to the Comparators in light of all the factors that would be relevant to an objectively reasonable governmental decisionmaker." And the Court dismissed Count III for the reason it dismissed Count III of the Second Amended

---

[16] The reference to "due process of law under Florida law" was the only allegation added to Count III of the Second Amended Complaint.

[17] The Town's motion for summary judgment was based on evidence obtained during discovery.

Complaint: PBT failed to "allege the [Florida] Constitutional or statutory provision giving rise to this cause of action."[18]

PBT moved the District Court "for reconsideration."[19]  The Court denied the motion, and PBT lodged this appeal.  It argues that the District Court erred in granting summary judgment on Counts I and II, erred in dismissing Count III, and abused its discretion in denying reconsideration.

III.

We consider first the summary judgment granted on Counts I and II.  We review the judgment *de novo*, viewing all facts in the light most favorable to PBT and drawing all reasonable inferences in its favor.  *See McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1141 (11th Cir. 2014).  The Town was entitled to the summary judgment on Counts I and II if there was "no genuine dispute as to any material fact and [it was] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A.

We consider first the District Court's disposition of Count I's substantive due process claim.  In its complaint, PBT alleged that "[b]ecause the utility lines at

---

[18] The District Court looked only to the allegations of Count III in making this statement. It did not consider Count III's incorporation by reference of the citation antecedent to Count I of the allegation that the Assessments violated Article VII, §§ 1(a) and 9(b) of the Florida Constitution and Fla. Stat. § 166.021(3).  *See supra* n.8.

[19] The motion was filed pursuant to Fed. R. Civ. P. 59(e).

PBT's Property are already undergrounded, the Town-Wide Underground Project does not improve the safety, reliability, or aesthetics at PBT's Property." Therefore, in its view, the Assessments failed to "confer[] any special benefit to PBT's Property" and were "arbitrary and capricious without any rational basis." PBT asserted that the "Town's enacting and imposing the Special Assessment is a legislative act." On appeal, PBT again argues that the Assessments violated its "substantive due process" rights because the Project "did not confer direct, special benefits logically related to" its property; therefore, the Assessments were "arbitrary and irrational as applied to [PBT's property]." Appellant's Br. at 28.

Ordinarily, the substantive component of the Fourteenth Amendment's Due Process Clause "protects those rights that are 'fundamental,' that is, rights that are 'implicit in the concept of ordered liberty.'" *McKinney v. Pate*, 20 F.3d 1550, 1556 (11th Cir. 1994) (en banc) (quoting *Palko v. Connecticut*, 302 U.S. 319, 325, 58 S. Ct. 149, 152 (1937)). Garden-variety property rights do not meet this standard and thus, as a general proposition, their deprivation does not in and of itself concern the concept of ordered liberty. *See DeKalb Stone, Inc. v. Cty. of DeKalb*, 106 F.3d 956, 959 n.6 (11th Cir. 1997) ("[C]ommon law rights are not equivalent to fundamental rights, which are created only by the Constitution.").

There is at least one exception to this rule. That is "[w]here a person's state-created rights are infringed by a 'legislative act,' the substantive component of the

14

Due Process Clause generally protects that person from arbitrary and irrational governmental action." *Kentner v. City of Sanibel*, 750 F.3d 1274, 1279–80 (11th Cir. 2014). We review this category of substantive due process challenges to legislative acts that do not implicate fundamental rights under the rational basis standard. *Id.* at 1280. "In order to survive this minimal scrutiny, the challenged provision need only be rationally related to a legitimate government purpose." *Schwarz v. Kogan*, 132 F.3d 1387, 1390–91 (11th Cir. 1998). However, the legislative exception does not include as-applied challenges, which "are always executive because the executive is responsible for applying, or enforcing, the law." *Hillcrest Prop., LLP v. Pasco County*, 915 F.3d 1292, 1301 (11th Cir. 2019). We are mindful that "non-legislative deprivations of state-created rights . . . cannot support a substantive due process claim, not even if the plaintiff alleges that the government acted arbitrar[ily] and irrationally." *Greenbriar Village, L.L.C. v. Mountain Brook*, 345 F.3d 1258, 1263 (11th Cir. 2003) (per curiam).

In its complaint and before this Court, we understand PBT to invoke the legislative exception for substantive due process claims. We therefore view Count I solely as a challenge to the Resolution itself.[20] To prevail on that challenge, PBT

---

[20] To the extent Count I challenges the Resolution as applied to PBT, that is a challenge to executive action, because "as-applied violations are always executive." *Hillcrest Prop.*, 915 F.3d at 1301. And "non-legislative deprivations of state-created rights . . . cannot support a substantive due process claim." *Greenbriar Village*, 345 F.3d at 1263. Thus, any challenge to the Resolution as applied to PBT fails as a matter of law.

was required to demonstrate that the Resolution, on its face, was arbitrary and irrational and not rationally related to a legitimate government purpose. *See Kentner*, 750 F.3d at 1279–80; *Schwarz*, 132 F.3d at 1391. Count I asserts that the Resolution is "arbitrary and capricious without any rational basis" because "the utility lines at PBT's Property are already undergrounded," and thus "the Town-Wide Underground Project does not improve the safety, reliability, or aesthetics *at PBT's Property*." Again on appeal, PBT asserts that the District Court erred in granting summary judgment in favor of the Town because "there remain genuine issues of fact regarding whether there are direct, special benefits *conferred on the Property* relating to reliability, safety, or aesthetics."

The fundamental flaw in these contentions, however, is that they take issue with the Resolution *as applied* to PBT and its property. As the District Court correctly observed, the question "is not whether the Town was *correct* in finding that [PBT] receives some measure of benefit from the project." Instead, since Count I only challenges the Resolution, the question is whether the Resolution itself is "rationally related to a legitimate government purpose." *Schwarz*, 132 F.3d at 1391. For that question, we apply "minimal scrutiny," and our minimal scrutiny makes clear that PBT failed to point to evidence sufficient to demonstrate that the Town lacked a rational basis for imposing special assessments to finance the project. *Id.* PBT has also failed to produce evidence sufficient to demonstrate

16

that the Town's determination that all of the properties located within the Underground Utility Assessment Area benefited from the Project—in the form of enhanced safety, reliability, and aesthetics—was arbitrary and capricious. *See Kentner*, 750 F.3d at 1279–80.

Count I alleges that the Resolution itself violates substantive due process. It is therefore not enough for PBT to claim factual disputes exist about whether the Town had a rational basis in imposing the Assessment on its property. Rather, PBT was required to come forward with evidence showing the Town lacked a rational basis in enacting the Resolution as a whole. Because it did not, the District Court correctly granted summary judgment in the Town's favor.

B.

We turn now to PBT's argument in support of Count II, that the imposition of the Assessments was foreclosed by the Equal Protection Clause because the Resolution expressly excluded the Comparators from its special assessment. PBT contends that the Comparators are similarly situated because, like the owners of the PB Towers properties, their utility lines had been undergrounded prior to the commencement of the Project.

PBT characterizes its equal protection claim, which is based solely on the Resolution's differential treatment of the Comparators, as a "class of one" claim. When presenting a class of one equal protection claim, a plaintiff alleges that it is

17

the only entity being treated differently from all other similarly situated entities, even though it does not belong to a suspect classification. *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S. Ct. 1073, 1074–75 (2000) (per curiam).  In order to prevail, a plaintiff must show that it "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Campbell v. Rainbow City, Ala.*, 434 F.3d 1306, 1314 (11th Cir. 2006) (quoting *Olech*, 528 U.S. at 564, 120 S. Ct. at 1074).

In this Circuit, we apply the "similarly situated" requirement "with rigor." *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1207 (11th Cir. 2007).  "[T]he [entities] being compared 'must be *prima facie identical in all relevant respects*.'"  *Irvin*, 496 F.3d at 1204 (emphasis in original) (quoting *Campbell*, 434 F.3d at 1314).  Put another way, "[d]ifferent treatment of dissimilarly situated persons does not violate the equal protection clause." *Campbell*, 434 F.3d at 1314 (quoting *E&T Realty v. Strickland*, 830 F.2d 1107, 1109 (11th Cir. 1987)).  A plaintiff must ultimately show that it and any comparators are "similarly situated 'in light of all the factors that would be relevant to an objectively reasonable governmental decisionmaker.'" *Douglas Asphalt Co. v. Qore, Inc.*, 541 F.3d 1269, 1275 (11th Cir. 2008) (quoting *Griffin Indus.*, 496 F.3d at 1207).

PBT cannot show that the Comparators are similarly situated in all relevant respects.  As proof that they are, PBT points to the fact that, like the utility lines

18

servicing the PB Towers properties, the Comparators' utility lines were undergrounded prior to the adoption of the Project. The Town responds that the Comparators are not similarly situated because their utility lines were undergrounded pursuant to separate projects that were funded *by special assessments*, not private funding. The Town Council therefore found that it was "fair and reasonable to exclude these parcels" from the Resolution's special assessment in order to avoid imposing duplicative special assessment obligations on the Comparators' properties. The PB Towers properties, on the other hand, were assessed because the Town Council found that *all* properties within the assessment area would receive a "baseline special assessment."

Given the relevant differences between the Comparators and the PB Towers—*i.e.*, the Comparators' owners' obligation to pay a separate undergrounding special assessment to the Town and the lack of such a special assessment in connection with the undergrounding of the PB Towers properties—all that PBT has shown is that the Town Council treated *dissimilar* properties differently. Such treatment does not implicate the Equal Protection Clause. *Campbell*, 434 F.3d at 1314. And even if they were similar, PBT fails to identify any evidence that an objectively reasonable governmental decisionmaker would consider the similarity it proffers. *See Douglas Asphalt*, 541 F.3d at 1275.

19

IV.

PBT further argues that the District Court erred in dismissing Count III of the Third Amended Complaint for failing to identify the provisions of the Florida Constitution or other relevant laws that the imposition of the Assessments supposedly violated. We review *de novo* the grant of a motion to dismiss for failure to state a claim. *Randall v. Scott*, 610 F.3d 701, 705 (11th Cir. 2010). In doing so, we accept the allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Id.* To survive a motion to dismiss, a complaint must present "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In addition, the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1965). While *Iqbal* and *Twombly* "concern the *factual* allegations a complaint must contain to survive a motion to dismiss," Rule 8 does "not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, 574 U.S. 10, 11, 12, 135 S. Ct. 346, 346, 347 (2014) (per curiam).

20

Count III alleged two distinct state law claims.  The first claim asserted that the Assessments constituted an "unconstitutional tax" under the "Florida Constitution and Florida law" because the Project conferred no special benefit on the PB Towers properties.  The District Court dismissed this claim for failure to identify the provisions of the Florida Constitution or law the Town Council purportedly violated.  We think the District Court was mistaken on this point. Count III incorporates the "General Allegations" section of the complaint.  The General Allegations, in turn, include citations to Article VII, Sections 6 and 9(b) of the Florida Constitution, as well as Florida Statutes §§ 170.01, 170.08, all of which deal with taxation and special assessments under Florida law.  Beyond that, Count III references the Raftelis Report, citing two Florida state cases.  One of those cases, *City of Boca Raton*, outlines the "two requirements for the imposition of a valid special assessment under Florida law."  595 So. 2d at 29.  The other case, *Whisnant v. Stringfellow*, 50 So. 2d 885 (Fla. 1951), considered whether a tax was a special assessment under the Florida Constitution.  *Id.* at 885–86.  Although Count III's passing references to these authorities may be an "imperfect statement of the legal theory," the cited authorities do provide a legal theory, and thus Rule 8 does not require dismissal.  *See Johnson*, 574 U.S. at 11, 135 S. Ct. at 346.

The second claim alleged that if the Project conferred a special benefit on the PB Towers properties, the amount of the Assessments exceeded the special

21

benefit and to that extent the Assessments constituted a "taking [of] property without due process of law under Florida law." Count III cites no provision of the Florida Constitution or law that treats an uncompensated governmental taking, which is what PBT presumably alleges, as a "taking of property without due process of law." And we are aware of none.

The Florida Constitution does have a takings clause. Article X, § 6(a) states that "[n]o private property shall be taken except for a public purpose and with full compensation therefor paid to each owner or secured by deposit in the registry of the court and available to the owner." *See also St. Johns River Water Mgmt. Dist. v. Koontz*, 77 So. 3d 1220, 1226 (Fla. 2011), *rev'd on other grounds*, 570 U.S. 595, 133 S. Ct. 2586 (2013). The Florida Supreme Court "has interpreted the takings clauses of the United States and Florida Constitutions coextensively." *Id.* If we consider PBT's takings claim as having been brought under Article X, § 6(a), it fails for the same reason the District Court gave when dismissing the federal takings claim alleged in Count I of the Amended Complaint: "[T]he Takings Clause does not apply to [a] mere obligation to pay an assessment."

In fine, the District Court was correct to dismiss the state law takings claims asserted in Count III, but erred in dismissing the state law claim alleging an unconstitutional tax. However, this latter claim was properly before the District Court only based on supplemental jurisdiction. Because the federal claims were

22

properly dismissed, the District Court "may decline to exercise supplemental jurisdiction over" this state law claim on remand. 28 U.S.C. § 1367(c)(3). That way, the Florida courts can interpret their own constitution and statutes.

V.

Finally, PBT argues that the District Court should have granted its motion for reconsideration. PBT claims that new evidence discovered after the District Court disposed of the case raises a genuine issue of material fact regarding its federal constitutional claims.

PBT filed its motion under Federal Rule of Civil Procedure 59(e). We review the District Court's denial of a Rule 59 motion for abuse of discretion. *Drago v. Jenne,* 453 F.3d 1301, 1305 (11th Cir. 2006). "The only grounds for granting [a Rule 59] motion are newly-discovered evidence or manifest errors of law or fact." *In re Kellogg,* 197 F.3d 1116, 1119 (11th Cir. 1999). "[A] Rule 59(e) motion [cannot be used] to relitigate old matters, raise argument[s] or present evidence that could have been raised prior to the entry of judgment." *Michael Linet, Inc. v. Village of Wellington, Fla.,* 408 F.3d 757, 763 (11th Cir. 2005). In the summary judgment context, the movant must show that the new evidence was unavailable at the time that summary judgment was granted. *Mays v. U.S. Postal Service*, 122 F.3d 43, 46 (11th Cir. 1997) (per curiam).

Putting aside the question of whether the new evidence was available when the District Court granted the Town summary judgment, the evidence PBT presented provided no basis for the court to reconsider its ruling. The evidence consists of testimony purportedly indicating either (1) that the PB Towers properties may not have received a specific benefit from the Project or (2) that the Comparators received one. This evidence was largely duplicative of the evidence already available when the District Court ruled. As such, it would not have changed the outcome. We accordingly find no abuse of discretion in the District Court's refusal to reconsider.

## VI.

For the foregoing reasons, the District Court's disposition of the claims set forth in the Third Amended Complaint and of PBT's motion for reconsideration are

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED**.